Nicholas WITTNER, on behalf of Brian
Christopher WITTNER, a minor,
Petitioner,

v.

SECRETARY OF THE DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, Respondent.

No. 90–3425V.

United States Court of Federal Claims.

Jan. 26, 1999.

Christopher Ted Olsen, Long Beach, California, for Petitioner.

Gabrielle Manganiello, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for Respondent.

## OPINION

MEROW, Judge.

This vaccine case is before the court on petitioner's motion for review of the special master's decision denying compensation under the National Childhood Vaccine Injury Act, 42 U.S.C. 300aa–1 to 300aa–34 (1994) (Vaccine Act), for injuries sustained by Brian Christopher Wittner. The special master determined that petitioner, Nicholas Wittner (Brian's father), failed to prove under the Table or non-table method that diphtheria-pertussis-tetanus (DPT) vaccinations caused or significantly aggravated Brian's encephalopathy and seizure disorder. *Wittner v. Secretary of Dep't of Health and Human Servs.*, No. 90–3425V (Fed.Cl.Spec.Mstr. Aug. 26, 1998). Petitioner contends that the special master's decision should be set aside for two reasons. First, he argues that she improperly permitted the Secretary of DHHS to contact and call as a witness Dr. Michael Nigro, a pediatric neurologist who treated Brian but who also was hired by petitioner as a non-testifying expert consultant. Second, he asserts that the special master's conclusion that he did not meet his burden of proof was arbitrary and capricious.

For the reasons stated below, it is concluded that the special master acted well within her discretion in allowing the testimony of Dr. Nigro. In addition, her finding that petitioner did not meet his burden of proof was reasonable and amply supported by the record. Accordingly, the special master's decision is affirmed.

## I. BACKGROUND

### a. Factual Background

Brian Christopher Wittner was born on July 24, 1985, in Detroit, Michigan. He received DPT vaccinations on October 5, 1985 (about two-and-a-half months of age); December 3, 1985 (about four months of age); and January 28, 1986 (about six months of age). The vaccinations were administered by Dr. Haas, a general practitioner.

In March of 1986, the Wittners took Brian to a pediatrician because of concerns about his development. Brian was then referred to Dr. Gary L. Trock, a neurologist, who evaluated Brian on March 11, 1986. According to Dr. Trock's records, the Wittners had recently become concerned about Brian because he was developing at a much slower rate than his sister had at the same age. Dr. Trock diagnosed Brian as having "static congenital

encephalopathy with resulting microcephaly, global developmental impairment, mild spastic tetrapareses, and upper motor neuron dysfunction." Pet.'s Ex. E at 1–2.

On April 14 and May 9, 1986, Brian was brought to another neurologist, Dr. Michael A. Nigro, Director of the Child Neurology Division of the Children's Hospital of Michigan. From May 13–16, 1986, Brian was hospitalized under Dr. Nigro's care. His medical records contain a history of Brian's condition provided by the Wittners. The records state that at four months old, Brian was sitting with slight support, smiling, and had good head control. At four to five months old, the Wittners noticed Brian had a very marked startle response during which he would throw his arms and head back. At six months, Brian's development seemed slow. He began to turn from front to back but was sitting only with support. He became less attentive and had an infrequent social smile. After six months of age, Brian became more withdrawn and very rarely smiled or interacted. While Brian's head circumference was at the 50th percentile at about one month of age, it fell to the 5th percentile by seven months. On May 3, 1986, Brian had a grand mal seizure lasting 2–3 minutes. The seizure was marked by muscular contractions and extensions every 5–10 seconds. Brian's eyes rolled back and he was afebrile. The Wittners reported that there had not been an episode like this before. Pet.'s Ex. F at 226–27.

Dr. Nigro's impression was that Brain had a progressive encephalopathy manifested by decreasing head growth, diminished responsiveness, and startle reactions with epilepsy. Brian was discharged on May 16, 1986, and follow-up visits with Dr. Nigro were arranged. In total, Dr. Nigro treated Brian for nearly five years, from April 1986 through February 1991.

Currently, Brian is severally mentally retarded. He cannot walk or talk and has limited self help skills. He has a combination of diffuse and focal neurologic abnormalities, hypertonia and hypotonia, a poorly con- trolled seizure disorder, and limited social awareness.

### b. Proceedings Before the Special Master

On October 1, 1990, Mr. Wittner filed a petition on behalf of Brian seeking compensation under the Vaccine Act. In the petition (as amended on September 20, 1995), he alleged that Brian suffered the onset or significant aggravation of an encephalopathy and seizure disorder within 72 hours of his DPT vaccinations, as provided in the Vaccine Injury Table. See 42 U.S.C. 300aa–14(a). In the alternative, he alleged that the vaccinations actually caused or significantly aggravated Brian's condition. See 42 U.S.C. 300aa–11(c)(1)(c)(ii)(II).

On March 4, 1991, Mr. Wittner filed supporting documentation, including affidavits from himself and Dr. Nigro. Mr. Wittner stated in his affidavit that Brian appeared normal for the first "three to four months" of his life and "began to startle in an exaggerated way in late October and November." First Wittner Aff. ¶ 3. Dr. Nigro attested that the onset of Brian's neurological regression "coincides with the DPT vaccinations" and that the vaccinations "may have contributed to or aggravated Brain's encephalopathy." First Nigro Aff. ¶¶ 3–4.

The special master held an evidentiary hearing on March 21 and September 25, 1997. Testifying for petitioner were Mr. and Mrs. Wittner; Kathyrn Flanagan, Brian's babysitter; and Dr. Eric Saslow, a pediatric neurologist. Testifying for the Secretary were Dr. Arnold Gale, a pediatric neurologist, and Dr. Nigro.

### (1) Testimony of Nicholas Wittner

Mr. Wittner testified that Brian's birth was normal and he developed normally for the first three months of his life. After the first DPT vaccination, Brian was fussy, cried, and developed a fever. Mr. Wittner called Dr. Haas's office and was told that fever was a normal reaction to the vaccine. Brian's fever subsided the next day. Tr. I at 13–14, 42–49.[1]

---

1. "Tr. I" refers to the transcript of the March 21, 1997 hearing. "Tr. II" refers to the transcript of the September 25, 1997 hearing.

Mr. Wittner also testified that Brian became unresponsive, exhibited a fixed gaze, and began having startle seizures after the initial vaccination. In addition, Brian began to lose abilities he had previously acquired. Before the vaccination, Brian could hold up his head, smile, and prop himself up. However, by January 1986, he could no longer hold his head up, his mouth was drooping, and he was not interacting. Brian's seizures also became more pronounced and his head stopped growing. Tr. I at 46, 52–54.

The special master questioned Mr. Wittner about his first affidavit which states that Brian developed normally for the first three to four months of his life (i.e., until late October or November) and that his seizures began at the end of October rather than right after the first vaccination. Mr. Wittner explained that, at the time he prepared the affidavit, he did not have the family calendar to tie down the relevant dates. He also stated that, in determining when Brian's symptoms began, he counted July 1985 as the first month of Brian's life even though Brian was born on July 24. Calculated this way, three to four months of age would be early October, right around the time of the first vaccination.

### (2) Testimony of Cynthia Wittner

Mrs. Wittner testified that, prior to the first DPT vaccination, Brian was developing normally. After immunization, Brian cried and had a fever. Mrs. Wittner assumed this was a normal reaction to the vaccine. Tr. I at 206.

She testified that she and Mr. Wittner became concerned about Brian's development when he was four or five months old and that his seizures began around the same time. Tr. I at 201–06. At four months old, Brian was sitting with slight support, smiling, and had good head control. Tr. I at 220–21. Although he was able to roll over at about four-and-a-half months of age, he failed to attain additional milestones. Tr. I at 215. At six months old, he was less attentive and had an infrequent social smile. He then became more withdrawn and very rarely smiled or interacted. Tr. I at 221–22. Mrs. Wittner did not recall Brian exhibiting any significant symptoms after his second or third vaccination. Tr. I at 216.

### (3) Testimony of Kathryn Flanagan

Mrs. Flanagan, Brian's fill-time babysitter during infancy, testified that Brian seemed like a normal newborn prior to the first DPT vaccination but began to change sometime in the fall. She could not remember a date when the changes began. Tr. II at 98–99. She recalled that Brian had a fever and was extra fussy right after the first vaccination. Tr. II at 101–03. Around that time, within a week after the shots, Brian was taking longer to finish his bottles and was taking longer naps. Tr. II at 103–05. Also sometime in the fall, at least a week or two after the first vaccination, Brian became less attentive, stared, and had trouble tracking objects. Tr. II at 104–09. Mrs. Flanagan also testified that Brian began making jerky movements sometime in the late fall or early winter. Tr. II at 107, 124.

According to Mrs. Flanagan, Brain began having more intense and frequent startle seizures shortly after the second DPT vaccination. She could not recall how many days after the vaccination this began. Tr. II at 111–14. Mrs. Flanagan stated further that Brian seemed much worse at six months of age and seemed worse within a week after his third vaccination. Tr. II at 118–19.

She described the decline in Brian's condition as "pretty abrupt" in that his symptoms started sometime in the fall after the first set of shots. However, she testified that Brian gradually got worse. Tr. II at 119–20.

### (4) Testimony of Dr. Eric Saslow

Dr. Saslow testified as petitioner's expert witness. In Dr. Saslow's opinion, the pertussis vaccine caused or significantly aggravated Brian's encephalopathy. He explained that, given the lack of information suggesting a neurologic impairment existed prior to the first DPT, the first immunization more likely than not caused or significantly aggravated Brian's encephalopathy. Tr. I at 156, 162–63.

Dr. Saslow relied to a large extent on Mr. Wittner's testimony that Brian developed normally until his first DPT immunization and then exhibited an abrupt change

marked by a loss of affect, unresponsiveness, and startle responses, all of which reflect an encephalopathic state. Since these symptoms did not manifest themselves prior to the first vaccination, and since Mr. Wittner testified that they occurred within a short time after the first vaccination, with a noticeable worsening following the second and third vaccinations, Dr. Saslow made the connection between the vaccine and Brian's encephalopathy. He also relied on the lack of evidence that Brian's condition was caused by a factor unrelated to the vaccine. Tr. I at 157, 168, 190–91.

Dr. Saslow also found significant the fact that Brian's head size was normal at birth but dropped to the 5th percentile by seven months of age. He stated that, although head growth does not point to a specific etiology, it is a powerful indicator of neurologic health. Furthermore, while the absence of microcephaly at birth certainly does not prove all is well, it suggests some postnatal factor accounts for Brian's neurologic regression. However, based on the limited data in the record regarding Brian's head growth, Dr. Saslow could not determine when the decrease in the growth rate began. Tr. I at 158, 178–79, 182.

Finally, Dr. Saslow testified that if he accepted the histories of Brian's condition in the medical records and disregarded the testimony of Mr. Wittner, his opinion would change. While Mr. Wittner's testimony indicates there was an acute change in Brian's condition following immunization, the medical records document a chronic encephalopathy and do not relate the onset of Brian's symptoms to the vaccinations. Tr. I at 187–91.

### (5) Testimony of Dr. Arnold Gale

Dr. Gale testified as the Secretary's expert. The special master's summary of his testimony is incorporated herein. *See Witt-*

*ner,* slip op. at 9–10. Because the special master did not expressly rely on Dr. Gale's testimony in reaching her decision, it will not be addressed further.[2]

### (6) Testimony of Dr. Michael A. Nigro

Dr. Nigro was called by the Secretary, although he was not originally listed on the Secretary's witness list. During the April 18, 1997 hearing, Mr. Wittner testified that he asked Dr. Nigro in 1990 if he should file a Vaccine Act claim on behalf of Brian. According to Mr. Wittner, Dr. Nigro told him he thought the vaccine contributed to Brian's encephalopathy and that he should file a claim. Based on Dr. Nigro's advice and similar advice from another doctor, Mr. Wittner filed the present action. Tr. I at 93–95.

In light of Mr. Wittner's testimony, counsel for the Secretary asked to reserve the right call Dr. Nigro as a witness. Counsel for petitioner expressed concern regarding the possible disclosure of work product, stating that Dr. Nigro had worked as an expert for petitioner. The special master ruled that since Dr. Nigro was Brian's treating physician and could have relevant knowledge, either party could contact him and submit something from him. Tr. I at 95–98.[3]

The Secretary subsequently indicated that she intended to call Dr. Nigro as a witness. On September 15, 1997, the Secretary filed a declaration from Dr. Nigro stating that, from his review of his medical records and those of the Children's Hospital of Michigan, he found no indication that Brian's neurologic problems were immunization-related. Second Nigro Dec. ¶ 3.

At the start of the September 25, 1997 hearing, petitioner filed a motion *in limine* seeking to prohibit Dr. Nigro from testifying. Relying on Federal Rule of Civil Procedure

---

2. Petitioner asserts that Dr. Gale's "concessions and admissions" support a finding of entitlement. This assertion lacks merit. Dr. Gale testified that Brian did not suffer an acute encephalopathy which would result from vaccination. Instead, he found that Brain suffered a chronic encephalopathy which began prior to birth. Tr. I at 238–57. Hence, Dr. Gale's testimony provides no basis for concluding that the special master's denial of entitlement was arbitrary or capricious.

3. Contrary to petitioner's assertions, the special master never ruled that any testimony from Dr. Nigro would be limited to his "percipient observations" and whether he encouraged petitioner to file a claim. Tr. I at 96–98; Tr. II at 15–17. Consequently, petitioner's contentions in this regard lack merit.

26(b)(4)(B)[4] and related case law, petitioner argued that the Secretary should not be permitted to call Dr. Nigro as a witness because he was petitioner's own non-testifying expert consultant. In support, petitioner submitted a declaration stating that he had retained Dr. Nigro to serve as an expert witness and had discussed the case confidentially with him. Petitioner also submitted a July 10, 1997 letter to Dr. Nigro forwarding a check for $900 for a two-hour review of medical records and a fifteen minute phone conversation performed in 1995.[5]

The special master denied petitioner's motion. She stated that the Federal Rules of Civil Procedure did not determine the scope of testimony permitted in Vaccine Act proceedings. She also noted that, while Dr. Nigro may have been paid $900 for a brief consultation in 1995, he was also Brian's treating physician for five years. Therefore, she concluded that Dr. Nigro's testimony, including his opinions based on his treatment of Brian, was important to the resolution of the case. She held that either party, as well as the court, could call him as a witness, stating that Dr. Nigro "is the Chief of the Division of Neurology at Children's Hospital of Michigan. The man has great credentials. I would be foolish and not upholding the standards that I am supposed to uphold not to hear his opinion in this case. And so I will permit him to testify." Tr. II at 15–17.

Dr. Nigro testified that, based on his medical records, the onset of Brian's condition appeared to be subtle, or sub-acute, with a gradual onset as opposed to a sudden, abrupt regression. Brian appeared to be developing normally but later had a decreased head circumference and regression in milestones. Tr. II at 30, 33–34. The regression was subtle; there was no indication in the records of an acute onset relating to anything particular in time. Tr. II at 48. Dr. Nigro therefore diagnosed Brian with a progressive en-

cephalopathy manifested by decreasing head growth, diminished responsiveness, and startle reactions with epilepsy. Tr. II at 32–34. However, he noted that the significant progressive component of Brian's condition had stabilized and that his encephalopathy had reached a plateau and become chronic. Tr. II at 4446, 78–80.

This diagnosis stands in contrast to an encephalopathy which results from immunization, the onset of which is acute with significant and measurable symptoms, although the condition will later become static. Tr. II at 32–33. During Dr. Nigro's treatment of Brian, the Wittners never described the onset of his condition as abrupt or related the onset of his symptoms to the immunizations. Tr. II at 38, 40. As a result, although he stated in his first affidavit that the DPT vaccinations "may have" contributed to Brian's encephalopathy, he testified that he did not think the vaccinations were a probable cause of Brian's condition. Tr. II at 49. Dr. Nigro could not explain the cause of Brian's condition. This, however, is not unusual. Tr. II at 37–38, 46.

### c. The Special Master's Decision

On August 26, 1998, the special master issued her decision denying compensation. She first concluded that petitioner failed to prove the onset of Brian's encephalopathy or seizure disorder within 72 hours of the first DPT vaccination. In doing so she relied on the medical records and the testimony of Mrs. Wittner which indicate that Brian was exhibiting symptoms in late October or early November, well after the relevant three-day period. *Wittner*, slip op. at 12–14.

The special master weighed Mrs. Wittner's testimony heavily because she found her particularly credible. She assessed Mrs. Wittner as a "concerned and attentive" parent and found it "beyond belief" that if Brian were manifesting symptoms of an acute ence-

---

4.  Fed.R.Civ.P. 26(b)(4)(B) provides:

    A party may, through interrogatories or by deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial, only as provided in Rule 35(b) or upon a showing of exceptional circumstances under

which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

5.  Petitioner did not assert, and does not assert here, that he retained Dr. Nigro as an expert in March of 1991, when Dr. Nigro prepared his first affidavit.

phalopathy, Mrs. Wittner would have missed them or failed to seek immediate medical treatment. *Id.* at 14.

In contrast, the special master did not credit Mr. Wittner's hearing testimony that Brian's symptoms began immediately after the first vaccination in light of the conflicting statements in his first affidavit. She found unpersuasive his attempt to reconcile the conflicting testimony and held him to the statements in his affidavit which do not show on-Table onset. *Id.* at 13.

The special master also found that Mrs. Flanagan's testimony did not establish on-Table onset because she was unable to pinpoint the beginning of Brian's symptoms, testifying only that they began sometime in the fall. *Id.* at 14.

Next, the special master concluded that petitioner did not establish causation-in-fact because he offered no expert testimony in support of the theory. *Id.* at 14. In addition, she found no proof of significant aggravation because there was no evidence linking Brian's course to any of the vaccinations. *Id.* at 15.

Finally, the special master relied on Dr. Nigro's testimony and concluded that, rather than a sudden and dramatic worsening tied to a specific DPT vaccination, Brian experienced a subtle progression of symptoms. She held that Brian suffered from a chronic condition rather than an acute injury resulting from vaccination. The special master credited Dr. Nigro's testimony because of his impressive credentials and because his testimony was supported by the medical records. *Id.*

Petitioner filed his motion for review on September 25, 1998,[6] asserting that the special master's decision should be set aside because she improperly allowed Dr. Nigro to testify and wrongly concluded that petitioner failed to meet his burden of proof.

## II.   DISCUSSION

### a.   The Admission of Dr. Nigro's Testimony

Petitioner's first argument is that the special master should not have permitted the Secretary to call Dr. Nigro as a witness because he was hired by petitioner as a non-testifying expert consultant. Petitioner relies on Fed.R.Civ.P. 26(b)(4)(B) which provides, in relevant part, that a party may discover facts known or opinions held by a non-testifying expert hired by another party in anticipation of litigation or preparation for trial only "upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." Petitioner contends that since the Secretary did not show that exceptional circumstances exist, she should not have been permitted to call Dr. Nigro.

However, as the Secretary correctly argues and the special master correctly held, the range of evidence the special master may consider is not governed by discovery or evidentiary rules applicable in federal district courts. *See Munn v. Secretary of DHHS,* 970 F.2d 863, 873 (Fed.Cir.1992) (Federal Rules of Evidence inapplicable in Vaccine Act proceedings); *Stevens v. Secretary of DHHS,* 31 Fed.Cl. 12, 20–21 (1994) (Federal Rules of Civil Procedure inapplicable). "Congress desired the special masters to have very wide discretion with respect to the evidence they would consider and the weight to be assigned that evidence." *Whitecotton v. Secretary of DHHS,* 81 F.3d 1099, 1108 (Fed.Cir.1996). The special master is expected to conduct proceedings in an "inquisitorial" format and is permitted to "conduct[ ] discovery (as needed), cross-examination (as needed), and investigation." H.R.Rep. No. 101–247, at 513 (1989), *reprinted in* 1989 U.S.C.C.A.N. 1906, 2239. Thus, the special master "may require the testimony of any person and the production of any documents as may be reasonable

---

**6.** The Clerk's Office originally indicated that it received petitioner's motion on September 28, 1998, which would have been after the 30–day period permitted for filing. *See* 42 U.S.C. 300aa–12(e)(1); Vaccine Rule 23. However, this was later determined to be error and the records were corrected to reflect that the motion was filed on September 25, 1998. Accordingly, the Secretary's argument that petitioner's motion should be dismissed for lack of jurisdiction is rejected.

and necessary." 42 U.S.C. 300aa–12(d)(3)(B)(iii). She is to "consider all relevant, reliable evidence, governed by principles of fundamental fairness to both parties." Vaccine Rule 8(b).

In allowing the testimony of Dr. Nigro, the special master relied on the fact that he is a highly qualified expert in pediatric neurology who treated Brian for five years.[7] No other doctor identified in the record spent as much time treating Brian's neurologic condition, especially during the critical early portion of his life. Furthermore, Dr. Nigro's medical records pervade the record and played an important role in the case. In these circumstances, the special master plainly did not abuse her discretion in concluding that Dr. Nigro's testimony, including his opinions on the nature and cause of Brian's condition based on his five years treating Brian, was important and necessary to a proper resolution of the case.

Petitioner asserts, however, that he hired Dr. Nigro in preparation for trial and shared confidential information and litigation strategies with him. Furthermore, it is alleged that Dr. Nigro's opinions formulated as a consultant constitute attorney work product. Thus, petitioner reasons, the special master's decision to allow Dr. Nigro's testimony was fundamentally unfair and prejudicial.

As stated above, petitioner did produce evidence that he paid Dr. Nigro in July 1997, four months after the Secretary made known that she intended to contact and possibly introduce evidence from Dr. Nigro, for two hours and fifteen minutes of work performed in 1995. However, Dr. Nigro was Brian's treating physician for nearly five years. There is nothing unfair about allowing the testimony of the doctor who treated Brian for an extensive period, before the litigation began, for the very condition in question. Quite the contrary, excluding Dr. Nigro's testimony based on petitioner's scant evidence of a brief consulting relationship would have been unfair to the Secretary and inconsistent with Congress' intent that special masters be "vigorous and diligent in investigating factual elements necessary to determine the validity of petitioner's claim." H.R.Rep. No. 99–908, pt. 1, at 17, *reprinted in* 1986 U.S.C.C.A.N. 6344, 6357.

Furthermore, Dr. Nigro was never questioned about his consulting work for petitioner, and there is no indication that he revealed any confidential information, litigation strategies, or attorney work product. Indeed, the special master specifically instructed Dr. Nigro not to disclose any litigation strategies he may have learned from petitioner or his attorneys. Tr. II at 17–18. Consequently, there is no basis for concluding that petitioner was treated unfairly or prejudiced. The special master's decision to allow the testimony of Dr. Nigro, including his opinions on the nature and cause of Brian's condition, was reasonable and well within the broad discretion afforded her under the Vaccine Act.

### b. Petitioner's Challenge to the Special Master's Substantive Findings

### (1) Standard of Review

Upon a motion for review, this court may "set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. 300aa–12(e)(2)(B). Findings of fact are reviewed under the arbitrary and capricious standard which is "highly deferential to the factual findings of the special master." *Munn*, 970 F.2d at 869. "It is, after all, the

---

7. Even Fed.R.Civ.P. 26(b)(4)(B) does not bar discovery of information gained by expert consultants through their involvement in the facts of the case rather than through their consulting work. The rule limits discovery of experts' insights "only where they are developed for litigation, ordinarily at the instance of counsel. Thus, the courts have regularly directed discovery as to information possessed by experts but not developed in anticipation of litigation." *See* 8 Charles Alan Wright, Arthur R. Miller and Richard L. Marcus, *Federal Practice and Procedure* 2033, at 457 (2d ed.1994) (citing cases); *see also Baker v. Taco Bell Corp.*, 163 F.R.D. 348, 349 (D.Colo. 1995) (opinions of treating physicians "are a necessary part of the treatment of the patient. Such opinions do not make the treating physicians experts as defined by Rule 26(b)(4)(C)"); *Salas v. United States*, 165 F.R.D. 31, 34 (W.D.N.Y.1995) ("plaintiffs plan to elicit testimony from the treating physicians identified above as to causation [of plaintiff's injuries] does not bring those witnesses within the strict disclosure requirements of Rule 26(a)(2)(B)").

special masters to whom Congress has accorded the status of expert, entitling them to the special statutory deference in fact-finding normally reserved for specialized agencies." *Id.* at 871. Hence, so long as "the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Secretary of DHHS,* 940 F.2d 1518, 1528 (Fed.Cir.1991).

### (2) Establishing Entitlement Under the Vaccine Act

Assuming certain prerequisites have been met which are not at issue here, a petitioner can establish a right to compensation under the Vaccine Act through the Table or non-Table method. To make a *prima facie* case under the Table method, petitioner must prove, by a preponderance of the evidence, that the injured person: (1) received a vaccine listed on the Table; (2) sustained or significantly aggravated a Table injury corresponding to the vaccine; and (3) exhibited the first symptom or manifestation of the onset or significant aggravation of the injury within the Table time period. 42 U.S.C. 300aa–13(a)(1)(A), 300aa–11(c)(1)(C)(i). If a *prima facie* case is made, a presumption that the injury was caused or significantly aggravated by the vaccine arises. To overcome this presumption, the Secretary must show that a factor unrelated to the vaccine was the actual cause. 42 U.S.C. 300aa–13(a)(1)(B). *See generally Whitecotton,* 81 F.3d at 1102.

■ To make a *prima facie* case under the non-Table method, petitioner must prove, by a preponderance of the evidence, that even though the injury did not occur within the Table time period, the vaccination actually caused or significantly aggravated the injury. 42 U.S.C. 300aa–13(a)(1)(A), 300aa–11(c)(1)(C)(ii)(II). This requires proof that the vaccine was not only a but-for cause but also a substantial factor in bringing about the injury. *See Shyface v. Secretary of DHHS,* 165 F.3d 1344, 1351–53 (Fed.Cir.1999). Petitioner's burden of showing actual causation is heavy. *Whitecotton,* 81 F.3d at 1102. Proof of a temporal association between the vaccination and the onset or worsening of the injury does not suffice. *Grant v. Secretary of DHHS,* 956 F.2d 1144, 1148 (Fed.Cir. 1992). Similarly, "evidence showing an absence of other causes does not meet petitioners' affirmative duty to show actual or legal causation." *Id.* at 1149. Petitioner must present "proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect." · *Id.* at 1148. If a *prima facie* case is made, the burden shifts to the Secretary to prove that the injury was caused by factors unrelated to the vaccine. 42 U.S.C. 300aa–13(a)(1)(B).

Finally, to demonstrate entitlement under either the Table or non-Table method, petitioner's allegations must be substantiated by medical records or medical opinion. 42 U.S.C. 300aa–13(a)(1).

### (3) On–Table Onset or Significant Aggravation

■ The special master found that petitioner failed to prove Brian exhibited symptoms of an encephalopathy or seizure disorder within 72 hours of the first DPT vaccination as required to establish on-Table onset. *See* 42 U.S.C. 300aa–14(a). Petitioner's argument that this finding was arbitrary and capricious consists of a list of evidence supposedly contradicting it. The list includes: evidence that Brian was born after an uneventful pregnancy and developed normally before the first vaccination; evidence that Brian's head circumference was in the 50th percentile at three weeks of age but fell to the 5th percentile by seven months; evidence that Brian cried, had a fever, and was fussy immediately after the vaccination; Mr. Wittner's testimony that Brian began staring and became unresponsive immediately after the first vaccination; Mrs. Flanagan's testimony that Brian was irritable, took longer to finish his bottle, and took longer naps after the first vaccination; Mrs. Flanagan's testimony that she subsequently noticed that Brian was staring, inattentive, unresponsive, and having startle seizures; an October 12, 1985 photo of Brian in which he is said to be staring; and Dr. Saslow's testimony

that Brian experienced an encephalopathy and residual seizure disorder within three days of the initial vaccination. Pet.'s Mot. at 10–14.

Nothing on this list establishes that the special master's decision was arbitrary or capricious. While there is evidence that the growth rate of Brian's head dropped significantly between three weeks and seven months of age, nothing indicates that the decline began within 72 hours of the first vaccination. An October 12, 1985 photo in which Brian is supposedly staring also does not indicate the onset of an encephalopathy or seizure disorder between October 5 and October 8. Likewise, while the evidence shows that Brian cried and had a fever within 72 hours of the first vaccination, there is no medical evidence or testimony that these are signs of an encephalopathy or seizure disorder.

Next, while Mr. Wittner did testify that Brian's symptoms began immediately after the first vaccination, the special master did not credit his testimony in light of his conflicting affidavit and his unconvincing attempt to reconcile the inconsistent statements. "The fact-finder has broad discretion in determining credibility because [s]he saw the witnesses and heard the testimony. Such credibility determinations are virtually unreviewable by our court." *Bradley v. Secretary of DHHS*, 991 F.2d 1570, 1575 (Fed. Cir.1993) (citations and internal quotations omitted). Petitioner has not presented any valid reason to question the special master's decision to discount his hearing testimony.

Petitioner cites testimony from Mrs. Flanagan that Brian was taking longer to finish his bottle and longer naps after the October 5, 1985 vaccination. However, she never stated that these changes began within 72 hours of the vaccination. She stated only that they began sometime in the fall or within a week of the vaccination. Furthermore, she testified that Brian's inattentiveness, staring, and inability to track objects began at least a week or two after the vaccination and that his startle seizures began in late fall or early winter. Given Mrs. Flanagan's failure to pinpoint the onset of symptoms within 72 hours of the first vaccination, the special master reasonably concluded that her testimony did not establish on-Table onset.

Next, Dr. Saslow did testify that Brian's condition was caused by the first DPT vaccination. However, "[a] special master may reject an expert's testimony when it is reasonable to do so." *Mills v. Secretary of DHHS*, 27 Fed.Cl. 573, 578 (1993). Dr. Saslow's testimony was based in large part on Mr. Wittner's hearing testimony. He acknowledged that his opinion would change if he relied instead on the medical records. Since the special master discounted Mr. Wittner's hearing testimony and relied on the medical records, it was reasonable for her not to adopt Dr. Saslow's opinion. *See Bradley*, 991 F.2d at 1574 ("although medical opinions were offered in support of [petitioner's] testimony, those medical opinions were based largely on that testimony itself and, therefore, the special master could reasonably conclude that the medical opinions did not qualify 'to substantiate' that testimony").

Finally, even assuming the list of evidence cited by petitioner provided some indication of on-Table onset, it would not show that the special master's decision was arbitrary and capricious. The special master considered the evidence petitioner cites but reasonably chose to give more weight to other evidence not supporting a finding of on-Table onset. Specifically, she relied on the medical records and the testimony of Mrs. Wittner, both of which reflect a gradual onset of symptoms beginning at four to five months of age, well after the 72 hour window. Her decision to weigh the medical records more heavily than contrary hearing testimony was entirely appropriate. *See Cucuras v. Secretary of DHHS*, 993 F.2d 1525, 1528 (Fed.Cir.1993) ("oral testimony in conflict with contemporaneous documentary evidence deserves little weight.... Medical records, in general, warrant consideration as trustworthy evidence").

Petitioner is essentially arguing that "various pieces of evidence should have been given more or less weight by the special master. Such arguments as to the weighing of evidence, particularly where, as here, witness credibility is involved, do not demonstrate reversible error." *Hines*, 940 F.2d at 1527.

Since the special master's conclusion that petitioner did not prove on-Table onset after the first vaccination is rational and supported by the record, it is not arbitrary or capricious.

■ Petitioner also challenges the special master's determination that he failed to prove on-Table onset or significant aggravation after the second and third vaccinations.[8] However, in support, petitioner cites evidence indicating only that Brian's condition worsened around the same general time as or at some unspecified point "following" the second and third vaccinations. Pet.'s Mot. at 15–19. As the Secretary correctly argues, general statements that new symptoms appeared or became more severe "following" each immunization are too vague to show on-Table onset or significant aggravation. Since no evidence was presented showing specifically that Brian's symptoms began or became worse within 72 hours of any vaccination, the special master properly concluded that on-Table onset or significant aggravation had not been shown.

### (4) Actual Causation or Significant Aggravation

■ The special master concluded that petitioner failed to prove that the DPT vaccine actually caused Brian's condition because he did not provide any expert testimony supporting the allegation. Similarly, she found that petitioner did not prove the vaccine significantly aggravated Brian's injuries because there was no evidence linking the course of his condition to the vaccinations. In reaching these conclusions, the special master relied on Dr. Nigro's testimony that Brian experienced a subtle progression of symptoms, not an acute onset or worsening which would appear if caused by immunization. Dr. Nigro testified, and the medical records support, that nothing sudden and dramatic happened to Brian. *Wittner,* slip op. at 14–15.

Petitioner asserts that the special master's conclusions regarding causation-in-fact are arbitrary and capricious. In support, peti-

tioner cites evidence that the pertussis vaccine can cause an encephalopathy; that Brian's decline coincided with the vaccinations; and Dr. Saslow's opinion that Brian's encephalopathy was caused or significantly aggravated by the vaccinations. Pet.'s Mot. at 19–20.

However, even if DPT vaccine can cause an encephalopathy, no competent evidence was presented that it did in this case. Again, petitioner cites only evidence indicating that Brian's decline roughly coincided with the vaccinations. Temporal coincidence alone is legally insufficient to establish actual causation. *Grant,* 956 F.2d at 1148. Petitioner also cites Dr. Saslow's testimony but, as stated above, his opinions were based on Mr. Wittner's testimony which was discredited by the special master.

"Causation in fact requires proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect." *Grant,* 956 F.2d at 1148. No such proof was presented in this case. Furthermore, Dr. Nigro testified that Brian's condition was not vaccine-related and his opinion was supported by the medical records and the testimony of Mrs. Wittner. Since petitioner presented no competent proof of actual causation, and since the special master reasonably relied on Dr. Nigro's opinion and the evidence supporting it, her conclusion that petitioner did not prove actual causation or significant aggravation was not arbitrary or capricious.

### CONCLUSION

Congress assigned to the special masters "the unenviable job of sorting through these painful cases and, based upon their accumulated expertise in the field, judging the merits of the individual claims. The statute makes clear that, on review, the Court of Federal Claims is not to second guess the Special Master's fact-intensive conclusions." *Hodges v. Secretary of DHHS,* 9 F.3d 958,

8. Since the special master properly determined that Brian's symptoms did not begin within 72 hours of the first vaccination, she reasonably concluded that there was no basis for finding on-Table significant aggravation after the first vaccination. *See Wittner,* slip op. at 15.

961 (Fed.Cir.1993). Though Brian's concerned and caring parents have admirably pursued this claim, the record does not reflect that the special master was arbitrary or capricious in judging its merits. Accordingly, the special master's August 26, 1998 decision is **AFFIRMED**. The Clerk is directed to enter judgment accordingly.