Bettie Sue Ivy Bolling BEDDINGFIELD, Individually and as Next Friend of Dallas Samuel Bolling Beddingfield, Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–2654V.

United States Court of Federal Claims.

Oct. 2, 2001.

M. Michael Arnett, Oklahoma City, Oklahoma, for Petitioner.

Mark C. Raby, Washington, D.C., with whom were Vincent J. Matanoski, Senior Counsel, John Lodge Fuller, Deputy Director, Helene M. Goldberg, Director, and Stuart E. Schiffer, Acting Assistant Attorney General, Department of Justice, for Respondent.

## OPINION

BASKIR, Chief Judge.

On October 1, 1990, Petitioner Betty Sue Ivy Bolling Beddingfield filed a claim for compensation under the National Vaccine Injury Compensation Program (the Program), 42 U.S.C. §§ 300aa–10 to –34. Petitioner argued that her son, Dallas, suffered the first symptoms of an encephalopathy within the 72–hour time period allotted by the Program's Vaccine Injury Table (Table), and thus qualified for the presumption that his illness was caused by his September 11, 1987, diphtheria-tetanus-pertussis (DTP) vaccination.

The Special Master held a hearing on August 29, 2000, and gave a bench ruling that provided the reasoning for his later formal decision on September 6, 2000. He concluded that the symptoms arose outside the 72–hour period and that, consequently, Petitioner was not entitled to compensation under the Program. Petitioner timely moved for review of the Special Master's decision on October 6, 2000, alleging that his decision was arbitrary, an abuse of discretion, and not in accordance with the law.

Petitioner challenges the Special Master's reliance on a series of contemporaneous medical records which showed a later onset rather than the testimony of Petitioner and four other witnesses which placed the onset within the Table period. After examining briefs and hearing oral argument, we reluctantly deny Petitioner's motion and affirm the decision of the Special Master.

## PROCEDURAL NOTE

This opinion comes nearly one year to the day after Petitioner moved for review of the Special Master's decision. See 42 U.S.C., § 300aa–12(e). Originally, it appeared that this Court did not receive Petitioner's Motion

within the required 30 days after the Special Master's decision, and so Petitioner's case was dismissed on October 11, 2000. On November 27, 2000, we discovered that Petitioner's case somehow had been delivered to the Clerk's Office of the Court of Appeals for the Federal Circuit. Petitioner produced a copy of the processed $105 check, originally made out to this Court, but altered to read "Appeals" where it once read "Claims." There is no filing fee for review by this Court, but there is a fee for review by the Circuit. Further, some of the filed papers showed stamps of this Court dated October 6, but there was no record in our Clerk's Office. Ultimately, the Petitioner submitted documentary evidence establishing that the review petition had been timely addressed to this Court, and the Respondent agreed. Accordingly, on May 10, 2001, we ruled the petition had been properly lodged in a timely fashion.

### BACKGROUND

Petitioner's son, Dallas Beddingfield, is in his late teens. Due to extensive illness over the course of his childhood, he has experienced complicated migraine headaches, difficulty thinking, and behavioral problems. His recovery has been partial and he has trouble with balance and motor coordination.

There are two paths to compensation under the Program. One method presents an easier evidentiary burden, and allows Petitioner to secure compensation by showing that Dallas's injury or condition is listed in the Table; that his injury manifested itself within the time frame given by the Table; and that all other requirements of 42 U.S.C. § 300aa–13(a)(1) have been met.

If Dallas's symptoms did not arise within the Table's time frames, the Program still allows recovery, but Petitioner faces a tougher evidentiary burden. Petitioner must prove by a preponderance of the evidence that the vaccine, and not some other agent, was the actual cause of the injury.

Petitioner seeks compensation based on the Table. Thus, we focus our attention on evidence bearing on the date of Dallas's vaccination, the date on which his symptoms appeared, and the length of time between these dates.

He was born on January 31, 1982, and received a series of five DTP vaccinations. Petitioner has testified that Dallas suffered certain symptoms within a few hours following each of the first four vaccinations, all given in 1982: A body temperature of over 102 degrees Fahrenheit, vomiting, limpness, lethargy, inconsolable crying and high-pitched screaming. Petitioner further testified that within six hours following Dallas's fifth DTP vaccination, administered on Friday, September 11, 1987, he developed a temperature of 105 degrees Fahrenheit, his neck became extremely swollen, he projectile-vomited, was glassy-eyed, did not respond to external stimuli, and generally displayed shock-like symptoms. Although this vaccination is recorded on Dallas's Immunization Record For School Attendance, and an Authorization To Give DTP Vaccination form was filled out by Petitioner on that date, there are no corroborating medical records available from Dr. Vadee Kroft, who allegedly administered the shot.

Petitioner testified that she cared for Dallas through the weekend following this fifth vaccination, telephoned Dr. Kroft, her family physician, on Monday, September 14, and brought Dallas to see Dr. Kroft on Tuesday, September 15. Dallas's extreme reaction to this vaccination is also described in the oral testimony of Dr. Kroft, Dr. Kroft's office assistant Nancy Piar, and Dallas's grandparents, Mavis and Lowell Thompson. However, there is no written record of the Monday call, or his Tuesday appointment with Dr. Kroft. Both Dr. Kroft and her office assistant testified that it was their practice to make a written record of such "sick visits." When asked why she did not have a record of the Tuesday appointment, Dr. Kroft responded that she destroyed all of her office records. However, it appears that Dr. Kroft does have records from later that year.

Mr. Lowell E. Thompson, Dallas's grandfather, stated that he could not remember how much time passed between the onset of Dallas's symptoms and when he was hospitalized. Mr. Thompson explained: "I'm getting kind of old ...." (Tr. at 92.) Nancy Piar

could not remember whether Dr. Kroft could be reached for medical care over the weekend, and Ms. Piar attributed this difficulty of memory to a slight stroke that she suffered in 1992.

Petitioner alleges that Dallas's symptoms, set out above, persisted after September 11, 1987, for several months, into November 1987. Medical records reflect this later history. Petitioner sought medical attention from Dr. Dean D. Ettinger on September 28, 1987, 17 days after his vaccination. Dallas's symptoms recorded at this time included a sore throat and swollen neck. Dr. Ettinger's records do not, however, indicate that Dallas's symptoms had been going on for several weeks. Nor is there mention of the symptoms having begun after a DTP vaccination earlier that September.

Dallas went to the emergency room of Sierra Vista Community Hospital on October 11, 1987, and the records of this visit state: "P[atien]t went to doctor last Wednesday with swollen neck and sore throat." Ex. 12 at 305. Again, there is no mention of either the vaccination that occurred one month earlier, or the symptoms that are alleged to have occurred immediately after the vaccination.

In November 1987, Dallas visited Dr. Kroft again with a headache, fever, and vomiting. The records of those visits do not make reference to any earlier illness of Dallas, and Dr. Kroft's suggested diagnosis is gastroenteritis or the flu. There is also no reference to the mid-September vaccination.

Dallas was admitted to the University Medical Center on November 30, 1987, after a spinal tap on November 28. The records indicate that he was treated there through early December 1987. Dallas's symptoms at that time included headaches, vomiting, and ataxia. A "Discharge Summary," dated December 10, 1987, notes in its "History of the Present Illness" section: "Dallas was a 5-year-old boy who was well until early October ...." Ex. 10 at 212. An intern admitting note at p. 220 and a history form at p. 258 contain nearly the same language, with the latter stating that it is based on a "history given by mother today."

Dallas's subsequent medical history is extensive and recounts a childhood and adolescence marred by struggle with a brain illness that frustrated repeated efforts at diagnosis and treatment. On July 13, 1990, Dallas saw a Dr. Kaplan who noted that Dallas's "initial episode of difficulty ... was associated with an immunization." Ex. 5 at 187. This is the first medical record tying Dallas's illness to his vaccination. Also, a "Psychoeducational Report" by William Jenkins, Ph.D., dated October 2, 1991, notes: "Mother reports these problems started after 9/17/87, at the time Dallas had his DTP shot." Ex. 21 at 558. Subsequent medical histories repeat the connection with a "mid-September" or "September" DTP vaccination.

### FINDINGS OF THE SPECIAL MASTER

After comparing his impressions of the witnesses and their testimony to the medical records which addressed the same time period, the Special Master could not conclude that the history set out by the witnesses was accurate. He assumed that the opinion of Dr. Fisher, Petitioner's medical expert, was "perfectly accurate," and further concluded that if it were based on an accurate history, then Petitioner would "very likely" have a Table injury case. (Tr. at 104.)

However, the Special Master doubted the accuracy of the oral testimony on which Dr. Fisher relied. The Special Master believed that many of the symptoms described by the witnesses actually took place, but he could not accept the witnesses' recollections that the symptoms occurred within 72 hours of vaccination. The Special Master did not suggest any dishonesty on the part of the witnesses, but cited instead their probable confusion from the passage of years.

Calling it a "classic" type of history, the Special Master explained that when Petitioner first suspected that a vaccination may have caused Dallas's illness, her memories of Dallas's medical history may have changed. Petitioner came to remember Dallas's illness as beginning just after vaccination because she had discovered a possible cause for her son's mysterious illness.

Confronted with a conflict between the oral testimony of Petitioner and four other wit-

nesses, and contemporaneous medical records, the Special Master chose to place greater weight on the medical records. He further found it impossible to believe that Dallas's family would have allowed him to suffer at home for so long over the weekend with symptoms such as a 105 degree temperature and projectile vomiting, or that Dr. Kroft, after learning of these symptoms on Monday, would have instructed Dallas to stay home and see her the following day.

### STANDARD OF REVIEW

This Court may set aside the Special Master's findings of fact if they are found to be arbitrary or capricious. We review the Special Master's conclusions of law under the "not in accordance with law" standard, and discretionary rulings under the abuse of discretion standard. *See* 42 U.S.C. § 300aa–12(e)(2)(B); *Saunders ex rel. Saunders v. Sec'y of Health and Human Servs.*, 25 F.3d 1031, 1033 (Fed.Cir.1994).

This case turns on our review of the Special Master's findings of fact, and the relevant arbitrary and capricious standard is "well understood to be the most deferential possible." *Munn v. Sec'y of Health and Human Servs.*, 970 F.2d 863, 870 (Fed.Cir. 1992). "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y of Health and Human Servs.*, 940 F.2d 1518, 1528 (Fed.Cir.1991).

### DISCUSSION

The medical records that Petitioner presents to this Court make one point painfully clear. Dallas has suffered tremendously during his childhood and adolescence, and his family has gone to great lengths and numerous health care professionals to treat and cure his illness. Dallas has suffered encephalitis, meningitis, stroke, acute allergic reactions, and ataxia, all within the first twenty years of his life. Unfortunately, Dallas's protracted ill health cannot alone secure him compensation under the Program.

Petitioner has attempted to make out a "Table case" under the Program. As part of her case she must prove by a preponderance of the evidence that Dallas sustained his first symptom or manifestation of onset of an encephalopathy within 72 hours of his DTP vaccination.

To meet this burden, Petitioner has offered her own testimony, as well as her parents' testimony, and the statements of Dr. Kroft and Nancy Piar. It is this evidence and this evidence alone that would place Dallas's symptoms within the time frame required by the Table. While Dr. Fisher testified as an expert that Dallas's vaccination caused his encephalopathy, his testimony depends on the accuracy of the history given by Petitioner and others, and so his statements stand or fall with theirs.

The Special Master made clear that this evidence, standing alone, would be sufficient to meet Petitioner's burden. Indeed, Petitioner in her papers and in oral argument states that the statute requires nothing more from Petitioner than a *prima facie* case. However, Petitioner misunderstands the evidentiary burden posed by the statute, which requires Petitioner—even bringing a Table case—to establish the elements of that injury by a preponderance of the evidence. *See* 42 U.S.C. § 300aa–13(a)(1)(A).

Contrary to Petitioner's assertions, the Special Master based his conclusion on all the evidence. Petitioner's evidence was contradicted—implicitly, if not explicitly—by the contemporaneous medical records of his case, beginning on September 28. The Special Master chose to give more weight to the documentary evidence than to the oral evidence, and we cannot conclude that this was reversible error.

■ As a general rule, oral testimony in conflict with contemporaneous documentary evidence deserves little weight. *Cucuras v. Sec'y of Health and Human Servs.*, 993 F.2d 1525, 1528 (Fed.Cir.1993), *citing U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Not only is this Court inclined to give little weight to the oral testimony before it, but we are inclined to give considerable weight to the contemporaneous documentary evidence, especially since it is in the form of medical records. The Federal

Circuit has noted that "[m]edical records, in general, warrant consideration as trustworthy evidence.... With proper treatment hanging in the balance, accuracy has an extra premium." *Cucuras,* 993 F.2d at 1528.

 Each of these medical records represents the efforts of at least two parties to represent accurately Dallas's medical situation. First, there is the diagnostician, whose ability to help Dallas depends on his or her thorough understanding of his medical history. Second, there is Dallas's mother, Petitioner in this case, whose desire to see her son treated properly would compel her to tell each physician the full details of Dallas's illness. It is not plausible to think that so many physicians, at the time when memory is most reliable, could have failed to record a recent period of severe illness, and it is equally implausible that Petitioner, a loving mother, could have each time omitted from Dallas's medical history such violent symptoms as those alleged. We certainly do not doubt the credibility of Petitioner and her family; they tell the truth as they remember it. It is the inherent deficiencies of human memory, after traumatic events and the passage of many years, that caused the Special Master to look to and then to rely on sources other than Petitioner's testimony to find out what happened to Dallas and when.

As between contemporaneous documentary evidence, later documentary evidence, and later oral evidence, we find binding precedents and good sense strongly suggest that contemporaneous documentary evidence deserves the most weight. Bearing all of this in mind, the Special Master placed greater weight in the contemporaneous medical records than in the testimony of Petitioner and others. His decision stemmed from his review of all of the evidence before him, and he plausibly inferred that Dallas fell ill more than three days after his September 11 vaccination. On the record before us, we find that his decision was neither arbitrary nor capricious.

## CONCLUSION

For the foregoing reasons, Petitioner's Motion for Review is denied. The decision of the Special Master, dated September 6, 2000, is affirmed. The Clerk of the Court shall enter judgment accordingly.

IT IS SO ORDERED.